IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PHILIP TOTONELLY,

      Plaintiff/Counter-Defendant,

         vs.                      Case No. 09-1234-JTM

GALICHIA MEDICAL GROUP, P.A.,

      Defendant/Counter-Plaintiff.

MEMORANDUM AND ORDER

Dr. Philip Totonelly was employed with defendant Galichia Medical Group (GMED) until his employment was terminated in 2008 for performing medical work for another health care provider, allegedly in violation of his employment contract. Both parties have brought claims arising from or related to this termination, and both have moved for summary judgment. Totonelly contends that GMED knew of or permitted his outside employment, and that GMED is additionally responsible for accrued leave and incentive bonuses, as well as severance and notice wages under the Kansas Wage Act (KWPA), K.S.A. 44-313. GMED argues that plaintiff breached the agreement by surreptitiously and without permission engaging in outside employment, and that he was properly terminated in light of that breach, refusing to account for his outside earnings, and failing to complete patient medical records after he was first suspended. GMED seeks to recover, pursuant to the terms of the contract, the amount Totonelly earned from the outside employment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light

most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

### *Findings of Fact*

Phillip Totonelly is a medical doctor who practices interventional cardiology. In 2006, he lived and worked in the State of New York. Among other things, he was paid to provide services to patients of South Island Medical Associates at facilities in the greater New York City area. He also consulted as an expert medical witness in legal actions.

GMED, a multi-specialty medical group which serves patient needs throughout Kansas, recruited Totonelly for employment.

Dr. Totonelly and GMED entered into an employment agreement on June 25, 2007, which governs the terms and conditions of Dr. Totonelly's employment with GMED. Both parties had the assistance of legal counsel in negotiating the terms of the Agreement.

At the time of Dr. Totonelly's termination of employment, Joseph Galichia was the sole director of GMED, and Michael Tamburini was the Chief Operating Officer. Galicha Heart Hospital (GHH) is a separate but related entity of GMED. At the time of Dr. Totonelly's termination, Steve Harris was the CEO of GHH, and William Wild was its Chief Operating Officer. Throughout Dr. Totonelly's employment, Dustin Collins was a finance manager for GMED, and was responsible for calculating the physicians' eligibility for incentive bonuses pursuant to the physicians' individual agreements with GMED.

### The Employment Agreement

The Contract provided for a five year Initial Term of employment, during which Dr. Totonelly was expected to work "full time" for GMED, and "not less than 40 hours per week." Dr. Totonelly received an annual salary of $375,000, an opportunity to earn bonus payments, and up to six weeks annual Paid Time Off.

The Employment Agreement, which became effective on June 25, 2007, states that it will be interpreted, construed, and enforced according to the laws of the State of Kansas. At all relevant times, both Dr. Totonelly and GMED were represented by separate and independent legal counsel.

The Employment Agreement stipulates that the waiver of any breach of any provision of the Agreement shall not operate or be construed as a waiver of any subsequent breach. In addition, the Agreement provides:

ENTIRE BINDING AGREEMENT; AMENDMENTS. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, and supersedes and merges with all prior agreements, communications, and understandings between the parties relating to the subject matter hereof. No

3

amendments or additions to this Agreement shall be binding unless in writing and signed by the parties hereto, except as otherwise provided herein.

Any notices required or permitted to be given under the Agreement "shall be in writing…."

The Agreement specifically dealt with "moonlighting" activities by doctors:

"Full time" means that Doctor shall provide care and treatment to patients within the scope of Doctor's ability and expertise at the Employer's Wichita, Kansas facility not less than 40 hours per week. The Doctor's specific schedule will be as determined between Employer and Doctor; provided, however, that emergency, evening and weekend coverage may reasonably be assigned to Doctor by Employer. Doctor's duty schedule shall be determined by Employer and Doctor.

Paragraph 2 of the Agreement provides:

Doctor shall not engage in any other gainful occupation without the prior consent of Employer. Notwithstanding the above, Doctor may from time to time, outside Doctor's normal working hours, provide cardiac forensic medicine services ("Permitted Outside Activities") so long as such Permitted Outside Activities do not interfere with or require such substantial attention on the part of Doctor as to prevent Doctor from fully performing his obligations under this Agreement.

Paragraph 8 of the Agreement states:

All fees received for professional services rendered by Doctor to patients shall be the property of Employer. Doctor acknowledges that Doctor's service as an employee of Employer does not confer upon Doctor any ownership interest in or claim upon any fees charged by Employer for Doctor's services. All salaries, fees, stipends, honoraria, and other payments, other than from Employer, paid to Doctor for professional employment or as an independent contractor, including, without limitation for "moonlighting," teaching, speaking engagements, consultations, depositions, trial testimony, and other activities related to Doctor's expertise as a medical doctor, shall be the property of Employer. If any such payment is received directly by Doctor, and Employer has not agreed in advance in writing that Doctor may retain such payment, Doctor shall immediately pay such amount to Employer. Notwithstanding the above, Doctor may keep all salaries, fees and other payments paid to Doctor for the performance of Permitted Outside Activities referenced in paragraph 2 above.

The Agreement provides for termination due to certain qualifying events, including the death of the Doctor, mutual agreement in writing by both parties, loss of licensure to practice medicine in Kansas, among other events. The Agreement's termination provision further states:

This Agreement shall be terminated on the date of and upon the happening of any of the following events: ...

j.   In the event of a material breach of this Agreement by either party upon fifteen (15) days' prior written notice. If the breach is cured or corrected within such notice period, this Agreement shall remain in full force and effect. If such breach continues, this Agreement shall terminate upon the expiration of the notice period; ...

4

l.  Notwithstanding any of the provisions of subparagraphs "a" through "k" above, or any other provisions of this Agreement, upon ninety (90) days' prior written notice by either Employer or Doctor to the other, with or without cause. In the event notice is given under this paragraph, Doctor shall, if requested by Employer, continue to provide services during the continuance of such ninety (90) day period; or, alternatively, Employer may, in Employer's sole discretion, suspend the provision of physician services by Doctor within any Employer operated facility during the continuance of such ninety (90) day period. If Doctor's services are suspended by Employer, Doctor will be entitled to his salary during the ninety (90) day notice period.

(Employment Agreement, at ¶ 14). Paragraph 14 of the Agreement also provided that, in the event of a termination, "Doctor shall be entitled to receive only the compensation accrued but unpaid as of the date of termination and shall not be entitled to additional compensation except as expressly provided by this Agreement."

The parties agreed that if the contract was terminated pursuant to Paragraph 14(l), then the Agreement would remain in effect during the 90-day notice period, and would terminate at the expiration of the 90-day notice period.

The Agreement's provision regarding severance pay states:

In the event this Agreement is terminated by Employer during the Initial Term pursuant to paragraph 14, subparagraph l, Doctor shall be entitled to receive a severance payment equal to Doctor's Salary from the last full twelve (12) month period immediately preceding the date of termination…. Such payment shall be made in twelve (12) equal payments beginning on the first day of the month immediately following the date of termination.

(*Id*. at ¶ 10(c)).

Approximately four to eight weeks after starting at GMED, Dr. Totonelly began providing services to his former employer South Island, by reviewing and reporting on cardiac nuclear studies from patients in the New York area. The core of the dispute between the parties is whether this departure from the explicit terms of the contract, which banned such moonlighting, was somehow excused or permitted by GMED.

Totonelly first argues that the moonlighting did not interfere with his work at GMED and cites deposition testimony by Wild and Tamburini that his work was satisfactory. But the cited testimony only indicates that Totonelly's work was understood to be generally acceptable when

5

GMED was unaware of the moonlighting activity. Wild specifically testified that, on learning of the moonlighting, he believed Totonelly was in breach of the Employment Agreement.

Totonelly argues that the parties tacitly modified the Agreement through their course of practice, because its terms called for him to work at GMED's facility, when in fact he worked for Galichia Heart Hospital (GHH) and some rural facilities. But it should be noted that GHH and GMED share the same physical facility, and nothing in the Agreement precluded Totonelly from being assigned duties at GHH while working for GMED. Whether or not Totonelly's work for GMED at certain rural facilities may reflect a modification of the Agreement's provision that work would be in Wichita, there is nothing to indicate that this affected the independent and explicit contractual bar on retaining moonlight employment income.

Totonelly also contends that GMED knew about his moonlighting. He alleges that around September, 2007, Connie Tajchman, Galichia's Medical Staff Coordinator asked him about a telephone call she had received from Oneil Sinha, an administrator at South Island who called her concerning problems billing for Dr. Totonelly's work. Totonelly has testified that, around the same time, he told Dr. Jody Galichia that he was doing readings for South Island as a source of income for caring for his mother. Totonelly also states that in late winter 2007 and/or early spring 2008, he told Michael Tamburini or William Wild that he was doing readings for South Island, in the context of conversations about business practices related to cardiac nuclear studies as between GMED and South Island, and that, on or before March 25, 2008, he asked Tajchman if insurance coverage was available for readings he might do for South Island.

Tajchman has testified that she does not recall any telephone call from an Administrator at South Island, or that it was disclosed to her that Totonelly was performing work for a third party. Plaintiff has supplied no evidence that Ms. Tajchman, who was not an executive of GMED, had any authority to alter the terms of the Employment Agreement. Dr. Galichia testified that Totonelly never spoke of his moonlighting activities, and did not know that Totonelly was keeping over

$200,000 in fees generated from such activities. Tamburini and Wild have both testified that they only learned of the moonlighting in August, 2008.

Paragraph 8 of the Agreement precluded any income other than from Permitted Outside Activities, which were specifically defined in Paragraph 2. That provision was modified at the request of Dr. Totonelly, made through his attorney, that Totonelly be allowed to testify as an expert witness and retain fees from such services. Other than fees from these legal services, no other income or fees were exempt from Paragraph 8 of the Employment Agreement.

Dr. Totonelly advertises himself on the internet as a Forensic Medical Testimony Expert. On his website, Dr. Totonelly gives the following definition of "forensic examiner":

> Definition of a Forensic Examiner: The term Forensic Examiner refers to a professional who performs an orderly analysis, investigation, inquiry, test, inspection or examination in an attempt to obtain the truth and from which to make an expert opinion. Almost every professional field has a forensic application: emergency medicine, psychology, orthopedics, internal medicine, surgery, neurology, occupational medicine, radiology, pathology, psychiatry and toxicology, among others. A forensic examination would refer to that part of a professional's practice that is carried out to provide an expert opinion. Across the country the vast majority of professionals conducting forensic examinations do so only as a part of their regular practice. Forensic Examiners: Seek only the truth and conduct evaluations, examinations and inquires, and report the true results of their findings in an unbiased and objective manner. Remain totally objective and use their ability so that justice is served by accurate determination of the facts involved. Do not intentionally withhold or omit any findings or opinions discovered during a forensic examination that would cause the facts of a case to be misinterpreted or distorted. Are concerned only with establishing the truth and are not advocates. Professionals, whether they work for the government or are in private practice, should be free from any pressure in formulating their opinions.

On his website, Dr. Totonelly states his "Areas of Expertise," as follows:

> Dr. Philip Totonelly's review is of the highest professional level. He does not review a malpractice case in search of a cause of action. Rather, he directs his attention to identified "issues of concern". Dr. Totonelly does not participate with unprofessional agencies that employ a cadre of physicians looking to promote malpractice as an industry. If your case is accepted for review a one-week turn-around-time is standard. Dr. Totonelly evaluates both plaintiff as well as defendant cases and acceptance of a case is based solely on its merit.

Medical Malpractice/ Prior Case Experience:

- Invasive and Interventional Cardiology – Angiography, Angioplasty, Coronary By-pass complications, Non-Invasive Cardiology, Echocardiograph and Nuclear Cardiology: Doctor holds a Nuclear License

- Homicide – "Angel of Death" cases, suspicious nursing home deaths, Nursing home abuse

- Inmate/Correctional facility medical abuse.

### *The Incentive Bonus*

As noted earlier, the Employment Agreement set Dr. Totonelly's annual salary at $375,000. Under ¶ 10(b) of the Agreement, he was also eligible for an incentive bonus under certain conditions:

> In addition to Salary, Doctor shall be paid a bonus, if earned, on an annual basis, equal to forty percent (40%) of the actual net professional cash collections in excess of Seven Hundred Fifty Thousand Dollars ($750,000) received by Employer during the preceding twelve (12) month period on account of professional services personally performed by Doctor ("Bonus"). For example if an angioplasty procedure is billed by Employer to a patient or the applicable third party payor at $2,000 and $1,500 is paid, then $1,500 will be the net professional cash collection. There shall be an interim estimated payment of a pro rata portion of such Bonus on a quarterly basis, within thirty (30) days after the end of each fiscal quarter. A final accounting and reconciliation of such Bonus shall be completed by Employer within thirty (30) days following each annual anniversary date of this Agreement, or any earlier termination of this Agreement, and Employer or Doctor, as the case may be, shall immediately pay the other party any amount shown to be owed as a result of such reconciliation. Notwithstanding anything to the contrary contained herein, in no event shall the net cash collections credited to Doctor include any revenues related to the provision of pharmaceutical products to patients or to the provision of a "designated health service" as such term is defined under 42 U.S.C. 1395nn, as now in effect or as subsequently amended, and shall not include any revenues otherwise prohibited by law from being included in the calculation of Doctor's compensation.

The "angioplasty example" included in the Paragraph 10(b) of the Agreement was requested and drafted by counsel for Dr. Totonelly.

When a GMED physician provides a medical service to a patient, generally, there are two components to the fee charged to the patient: a professional services component and a technical services component. The services provided by the doctor make up the professional services

8

component. The services provided by the facility make up the technical services component. Facility fees may include services provided by facility employees (other than physicians) and fees associated with the use of equipment, among other services.

Medicare and other private payors may classify a particular service as a global charge. This means that the global charge contains both the professional and technical components. The patient is charged one fee—the global charge—which covers both the professional and technical components.

Bonus calculations for GMED physicians are based solely on monies received by GMED for the physician's professional services. Charges associated with the technical component of services are not included in the bonus calculation.

If a physician provides a service that has a global charge, then the professional services portion of the global charge must be extracted for purposes of calculating a physician's eligibility for bonus. This extraction is done per the published Medicare rates. GMED uses the same percentage of the professional services component versus the technical services component that Medicare has established, and applies that to all payments that are billed as global. Consistent with the law and the language in the Employment Agreement, only his actual net professional cash collections for professional services personally performed by Dr. Totonelly were included to determine whether he reached the threshold to receive a bonus. Cash collections for the technical component were not included.

In order to be eligible for a bonus for his first year of employment, Dr. Totonelly needed to bring in actual net professional cash collections in excess of $750,000 on or before June 30, 2008, the end of his first annual bonus period. On or about February 20, 2009, Michael Tamburini asked Dustin Collins, GMED's finance manager, to review Dr. Totonelly's actual net professional collections. Collins determined that GMED received $394,841 for services performed by Totonelly. As a result, he was not eligible for a bonus because his actual net professional cash collections did not exceed $750,000.

Collins also provided an accounting for the entire 14-month period Dr. Totonelly provided services at GMED. This accounting showed that Totonelly's actual net professional collections totaled only $594,865. In his first twelve months of employment, Dr. Totonelly was never on pace to reach the $750,000 bonus trigger.

The Agreement states that Dr. Totonelly was eligible to receive up to six weeks of paid time off per year for vacations, attendance at professional meetings, sick time and seminars, not including holidays. It also provided:

> Doctor shall not be entitled to receive any additional compensation from Employer on account of Doctor's failure to take time off as provided in this paragraph 12 or for any unused paid time off at the time of Doctor's termination of employment….

Paragraph 15 of the Agreement provides:

> With regard to completion of medical records, the Agreement states: Doctor shall timely maintain adequate medical records (signatures, dictation, notes, etc.) for all persons he examines or treats in connection with Doctor's employment hereunder. If Doctor has not timely completed all necessary medical records, then Doctor shall not be entitled to paid time off as contemplated by this Agreement…. Doctor shall be required to promptly complete the records and charts of every patient that Doctor shall have examined or treated.

### Medical Records

In addition to his services at GMED, Dr. Totonelly also performed medical services at a separate entity, Galichia Heart Hospital (GHH). At the time Dr. Totonelly ceased to perform services for GMED, GHH had over 200 incomplete medical records for professional services rendered by Dr. Totonelly. Totonelly failed to provide dictation for at least nine procedures. Many of the patient charts had more than one deficiency. The deficiencies totaled 488. On August 28, 2008, GHH informed GMED that Totonelly had numerous incomplete medical records.

GHH's Director of Health Information Management, Michele Houston-White, made several attempts to contact Dr. Totonelly via telephone in the weeks after August 28, 2008 in order to coordinate completion of the medical records. During that time period, Dr. Totonelly answered Ms. Houston-White's initial telephone call, but ignored the remainder of her calls and did not return her messages.

10

Dr. Totonelly attempts to controvert these facts by arguing that (1) he had no contractual duties directly to GHH, (2) his duties to GMED ended when he was fired on August, 27, 2008, and (3) that GMED relieved him of responsibility for finishing the records. These arguments are not persuasive. While Dr. Totonelly only contracted directly with GMED, the contract did not restrict where he was to provide medical services, and the contract explicitly provided that Totonelly would complete medical records for "*every patient* that the Doctor shall have examined or treated," without limitation to the patients at GMED. (Contract, ¶ 15 (emphasis added)). Nor did the contract provide any indication that the obligation to complete patient records ended as soon as Totnelly's last date of employment.

Finally, there is no basis in the record for finding that the defendant, by firing Dr. Totonelly on August 27, 2008, somehow waived its right to expect him to complete patient records. The evidence establishes that Tamburini, who gave Totonelly notice of the termination, was then unaware of the problem with the medical records. The contract obligated Dr. Totonelly to complete medical records for patients he saw while he was employed by GMED.

Sometime in 2009, Dr. Totonelly's attorney, Ed Picco, contacted Ms. Houston-White regarding the incomplete medical records. Ms. Houston-White burned images of the patient records for the approximately nine procedures with outstanding dictation onto CDs and mailed them to Dr. Totonelly with instructions for the completion of the dictation. Dr. Totonelly did not complete seven of the necessary dictations.

Houston-White also advised Picco that the remaining records were too voluminous for her to copy and send to Dr. Totonelly's attention for completion, but that GHH would permit Dr. Totonelly to hire a temp service to copy the remaining records that needed his attention. Dr. Totonelly never made arrangements for the remaining records to be completed.

It is uncontroverted that, to date, Dr. Totonelly has not completed most of the outstanding medical records at GHH.

11

*The Termination*

From June 25, 2007 through August 27, 2008, Dr. Totonelly performed medical services for third parties, and was paid approximately $331,999.822 for those services.

None of the medical services Dr. Totonelly provided to third parties were related to legal proceedings or in the capacity of an expert witness. Rather, Dr. Totonelly earned these fees from reading nuclear studies for patients of a third party.

GMED did not agree in advance in writing that Dr. Totonelly would be permitted to retain payment for services rendered to the New York medical group. It was never aware that, while employed by GMED, Dr. Totonelly was keeping over $200,000 in fees generated from performing medical services for third parties until Steve Harris informed GMED of Dr. Totonelly's moonlighting activities in August, 2008.

In August, 2008, Dr. Totonelly told Steve Harris, CEO of GHH, and Bill Wild, COO of GHH, that he was receiving income from performing professional medical services for a New York medical group. Shortly afterward, Harris told Dr. Galichia and Mr. Tamburini of the moonlighting.

Tamburini's first knowledge of this moonlighting activity was shortly before August 27, 2008, when he met with Dr. Totonelly to state that his employment was terminated. Tamburini gave Totonelly a letter which referenced Paragraph 8 of the Employment Agreement, and stated that "any such monies received by you for providing such services [interpreting nuclear studies for another facility] are the property of the Galichia Medical Group, P.A. and must be accounted for and paid immediately."

Totonelly moved from Wichita back to New York within a week of the August 27, 2008, meeting. He did not respond to the August 27, 2008 letter, and did not provide an accounting of income earned from providing services to the New York medical facility, nor did he pay any monies earned for such services to GMED.

During his employment, GMED paid Totonelly gross pay of $14,423.08 and net pay of $9,001.15 for 80 hours salary every two-week cycle of employment. Compensation GMED paid Dr.

Totonelly for the two-week pay cycle August 14-27, 2008, included pay of 64 hours regular salary and 16 hours vacation pay. GMED continued to pay Totonelly during the 90-day notice period. From August 29, 2008, through November 5, 2008, GMED paid Totonelly weekly wage payments at his regular rate. GMED's last wage payment to Dr. Totonelly was made on November 14, 2008, for the pay period October 23-November 5, 2008.

Between August 27, 2008 and September 9, 2008, GMED learned that Dr. Totonelly had a significant number of medical charts at GHH that needed to be completed. Tamburini sent a letter on September 9, 2008 confirming the suspension of services under 90-day notice provision in Paragraph 14(l). The letter also discusses numerous medical records that Dr. Totonelly had failed to complete, and directs Dr. Totonelly to contact Vicki Dwyer, GMED's Compliance and Privacy Officer, in order to complete the records. The September 9 letter cites to Paragraph 15 of the Employment Agreement, and its requirement that Dr. Totonelly "promptly complete the records and charts of every patient that [Dr. Totonelly] examined or treated," and also asked for an accounting and documentation regarding monies earned for services provided to third parties.

Totonelly did not contact Ms. Dwyer regarding the completion of medical records. Totonelly contends that this was because he never saw the September 9 letter, which was addressed to his Wichita address, while he had moved back to New York immediately after his termination. But the September 9 letter satisfied the explicit requirements of the Employment Agreement, which provide that all notices be sent to the Doctor's last known address. It is uncontroverted that the September 9 letter was sent to the last known address given by Dr. Totonelly to GMED.

Dr. Totonelly did not provide the requested accounting and documentation regarding his services to third parties.

Tamburini wrote again to Totonelly on October 30, 2008, stating that GMED was giving him notice pursuant to Paragraph 14(j) of the Agreement that Dr. Totonelly was in material breach of Paragraphs 8 and 15 of the Employment Agreement due to his failure to pay monies to GMED for

services provided to third parties, and for his failure to complete medical records. The letter stated that Dr. Totonelly had fifteen days to cure the breaches

Dr. Totonelly did not complete the incomplete medical records within the 15-day period to cure, or provide an accounting or remit payment for services provided to third parties. Instead, on November 3, 2008, Dr. Totonelly sent Mr. Tamburini a letter denying any breach.

Dr. Totonelly received his salary and benefits from GMED through November 14, 2008.

Dr. Totonelly's employment agreement was terminated as of November 14, 2008, pursuant to Paragraph 14(j) of the Agreement, due to Dr. Totonelly's failure to cure his material breaches within the 15-day period.

***Conclusions of Law***

***Breach of Contract***

GMED has moved for summary judgment on its claim that, pursuant to the anti-moonlighting clause of the contract, all moneys obtained for the provision of medical services would belong to GMED.

As noted earlier, the parties explicitly agreed in their employment contract that Kansas law would govern the contract's interpretation, construction, and enforcement. Absent any just reason for relief from this agreement, the court will give effect to this intention. *See Quenzer v. Quenzer*, 225 Kan. 83, 85, 587 P.2d 880 (1978); *see also Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 713, 732 P.2d 741 (1987). Under Kansas law, a claim for breach of contract requires proof of the existence of a contract, supported by sufficient consideration, which the claimant was willing to perform but which was breached by the other party, thereby damaging the claimant. PATTERN INSTRUCTIONS OF KANSAS — Civil 3d § 124.01-A.

The uncontroverted facts support a finding that Totonelly breached the employment contract by engaging in prohibited outside activity, and the court grants GMED's Motion for Summary Judgment. Paragraph 8 of the Agreement explicitly barred Totonelly from receiving any fees for

moonlighting activities. The Agreement provided that any fees for such services would belong to GMED, unless the payments were rendered for a Permitted Outside Activity, or GMED agreed, in writing, prior to the moonlighting activity.

The Agreement, which was the product of careful negotiation between the parties and rendered with the assistance of counsel, narrowly defined Permitted Outside Activities as the provision of "cardiac forensic medicine services." This term is not ambiguous, and created a limited opportunity for Totonelly to continue work providing expert medical advice or testimony in connection with litigation. *See* Black's Law Dictionary (9th ed. 2009) (defining "forensic" as "used in or suitable to courts of law or public debate"). *See also, e.g., United States v. White*, 21 F.Supp.2d 1197, 1199 (E.D. Cal. 1998) (defining a "forensic psychiatric examination" as one which "focuses on the mind in relation to legal principles and cases."). The uncontroverted facts establish that Totonelly received substantial payments for providing medical advice wholly unrelated to actual or pending litigation. Instead, Totonelly received $331,999.82 for interpreting nuclear studies for patients for a third party medical practice. Nor did GMED ever consent to the provision of these services.

Totonelly contends that GMED breached the contract by failing to give him a bonus, grant severance, and not paying him for him for unused paid time off at the time of his termination. The court finds that Totonelly has failed to show any breach by GMED.

Under the Agreement, Dr. Totonelly was eligible for a bonus if GMED collected more than $750,000 in payment for his professional services during the preceding twelve month period. Paragraph 10(b) of the Agreement specifies that the bonus level is not determined by the amount of billed services, but the amount of actual cash payment received by GMED. In addition, the payments are included only to the extent that they reflect charges for physician services, rather than technical or  hospital charges. The uncontroverted facts establish that Totonelly did not reach the $750,000 level, but instead earned $394,841 in actual net professional cash collections during his first year.

In his entire 14-month employment, Totonelly earned $594,865 in actual net professional cash collections.

The court also finds that GMED did not breach the Agreement by suspending payment of Totonelly's salary and denying severance, once it discovered his prior and material breach of that same Agreement. By that material breach, Totonelly had acquired over $300,000 in payments that, under the terms of the Agreement, were actually the property of GMED. Totonelly materially breached the Employment Agreement and wrongfully withheld GMED's property. Any expectation that GMED would pay his salary under these circumstances is ridiculous at worst and unrealistic at best. *See Zhitlovsky v. Valeo Behavioral Health Care, Inc.*, 181 P.3d 589, No. 98,272, 2008 Kan. App. Unpub. LEXIS 303 (Kan. Ct. App. 2008).

Here, on first learning of Totonelly's moonlighting, GMED exercised its rights under Paragraph 14(l) and gave notice on August 27, 2008, that it was terminating the Agreement. Paragraph 14(l) authorizes the termination of the Agreement by either party, with or without cause, on 90 days notice. In the event of termination under Paragraph 14(l), the physician is entitled to 12 months of severance. By the same notice, GMED sought an accounting for the moonlighting fees received by Totonelly. On September 9, GMED notified Totonelly that his services were suspended during the 90-day period, and again demanded an accounting. In addition, GMED demanded that Totonelly complete preparation of the medical records, pursuant to Paragraph 15. It is uncontroverted that Totonelly did not provide any timely accounting, and failed to complete the medical records as requested by GMED.

GMED gave notice on October 30, 2008, that it was terminating Totonelly's employment immediately under Paragraph 14(j). Paragraph 14(j) authorizes termination without extended notice, in the event of a material breach and failure to cure within 15 days. GMED continued to pay Totonelly salary and benefits until November 14, 2008.

On November 3, 2008, Totonelly denied the existence of any material breach, but it is controverted that he did not disgorge the moonlighting payments or complete the medical records

16

within the 15-day period. The court finds that GMED properly terminated the Agreement under Paragraph 14(j), based upon the plaintiff's engaging outside work beyond the scope of the Permitted Outside Activities as defined in Paragraph 8, his failure to account for moneys received for such work, and his failure to complete medical records.

GMED was bound to follow the 90-day provision for termination under Paragraph 14(l) only in the event of termination without cause. But the contract does not force GMED to abandon other remedies if it subsequently discovers a material breach. To the contrary, the contract essentially gave GMED a choice of remedies by permitting an earlier termination in the event of a material breach, and nothing in the facts before the court suggests that GMED unreasonably or inexcusably delayed efforts to enforce its rights. *See Sprint Communs. Co. L.P. v. Vonage Holdings Corp.*, 500 F. Supp. 2d 1290, 1335 (D. Kan. 2007). To the contrary, the facts establish that GMED moved promptly once it learned of the extent of the plaintiff's moonlighting activities.

Totonelly argues that although the contract may have explicitly barred moonlighting activities, GMED waived this bar, or permitted the contract to be modified so as to permit its removal. The court finds that the plaintiff's defenses of waiver and estoppel are without merit.

Paragraph 8's careful definition of the permitted scope of the plaintiff's outside employment was the product of careful deliberation, and its terms could only be modified by GMED's written consent. The provision unambiguously precludes outside employment of the type performed by the plaintiff. Paragraph 25 of the Agreement requires that any attempts at modification be accomplished in writing, and the uncontroverted facts establish that GMED never provided such written consent.

Of course, this type of provision may be waived, but such a relinquishment must be intentional on the part of GMED. *Zwygart v. Bd. of County Comm'rs*, 483 F.3d 1086, 1094 (10th Cir. 2007) (applying Kansas law). The intention to waive contact provisions will not be inferred from silence; the party claiming waiver must show the other contracting party acted in a way which unequivocally demonstrates its intention to relinquish a contractual right. *Id.* (quoting *Patrons Mut. Ins. Ass'n v. Union Gas Sys., Inc.*, 250 Kan. 722, 830 P.2d 35, 39 (Kan. 1992)).

The plaintiff here falls well short of this burden. He argues, for example, that an intent to modify the contract is shown by GMED's requiring him to complete work off-premises. As noted earlier, the contract established that Totonelly would work *for* GMED, but does not explicitly require him to work *in* GMED; the contract contains no geographic restriction or prohibition on occasional work in other facilities. Even if such work at other facilities was inconsistent with the contract — and it is not — it fails to demonstrate any intention by GMED to waive the limitation on moonlighting established under Paragraph 8.

Further, the remaining uncontroverted facts fail to show an unequivocal intention by GMED to abandon the moonlighting restriction. The plaintiff cites only two instances in which he allegedly mentioned performing outside work to GMED supervisors — once to Dr. Galichia (during a conversation about his mother), and once to Mr. Tamburini "and/or" Mr. Wild (during a conversation about nuclear procedures).[1] But GMED could manifest an intention to waive its contract rights only if it was aware of the exact nature or extent of Totonelly's moonlighting, and the facts demonstrate that it had no such knowledge.

That Totonelly might be engaged in some outside work would not in itself warn GMED that the moonlighting was not permitted under the contract. Paragraph 8, after all, explicitly permitted Totonelly to engage in some outside employment in the form of providing forensic medical services. Moreover, it is uncontroverted and conceded by the plaintiff that GMED only learned of the scope of his moonlighting in August, 2008, shortly before his termination.

Further, any oral waiver or modification of the moonlighting clause requires some additional consideration. *Law Co. v. Mohawk Constr. & Supply Co*., 702 F. Supp. 2d 1304, 1330 (D. Kan. 2010). Such additional consideration is absent here, as Totonelly was already employed by GMED, and was entitled to his services in exchange for his agreed compensation.

---

[1] Totonelly also stresses that he mentioned the outside work to Connie Tajchman of GMED, but the facts show that Ms. Tajchman was a non-officer employee of GMED who worked to coordinate the medical staff. She had no actual or apparent authority to determine GMED contractual rights.

Dr. Totonelly also claims compensation for unused paid time off at the time of termination. However, Paragraph 12 of the Agreement explicitly provides: "Doctor shall not be entitled to receive any additional compensation from Employer on account of Doctor's failure to take time off as provided in this paragraph 12 or for any unused paid time off at the time of Doctor's termination of employment." As a result, the plaintiff has failed to show that GMED breached the Agreement by failing to provid for paid time off which had not been used at the time of termination.

### Promissory Estoppel

In addition to his claim that GMED breached the Agreement, Dr. Totonelly presents a claim of promissory estoppel, contending that, when he moved back home to New York, he relied on GMED's August 27, 2008 termination, which he interpreted as a representation that he would receive severance under Paragraph 14(l).

The court grants GMED summary judgment on plaintiff's promissory estoppel claim for two reasons. First, such a claim is unwarranted where the parties have independently defined their rights by explicit contract. "Promissory estoppel is an alternative theory of recovery to a breach of contract claim[,] applicable only in the absence of an otherwise enforceable contract." *Pizza Management v. Pizza Hut.*, 737 F. Supp. 1154, 1167-1168 (D. Kan. 1990) (internal citations omitted). Here, the plaintiff's claim rests on his failure to obtain a contractual right (his claim to severance under Paragraph 14(l)). Accordingly, his right to this benefit must be determined with reference to the terms of the contract itself.

Nor is there any basis for concluding that Totonelly actually and reasonably relied to his detriment on GMED's August 27, 2008 notice, as nothing in the notice suggested any waiver of GMED's rights to immediately terminate the Agreement under Paragraph 14(l) in the event of continuing and uncured material breach.

### Statutory Claim

As noted earlier, the plaintiff has filed a separate motion for partial summary judgment, seeking a determination that GMED's failure to pay him twelve months severance pay represented a failure to pay earned wages within the meaning of the Kansas Wage and Payment Act (KWPA), 44-313. The court denies plaintiff's motion for two reasons.

First, the KWPA claim — advanced for the first time in plaintiff's summary judgment motion — is plainly untimely under Fed.R.Civ.Pr. 8(a). Although plaintiff tries to justify this claim based on statements made by the court at the conference with counsel on April 18, 2011, at no time has the court given its imprimatur to such dilatory pleading. Rather, the court simply observed, at the conclusion of a conference which arose from the contentiousness of the parties and their inability to reach an agreed pretrial order before the Magistrate Judge, that the court would deal with all issues — including timeliness — by summary judgment. The court deferred any resolution of specific issues, and at no time ruled that otherwise valid and legitimate Rule 8(a) defenses could not be advanced in response to a motion for summary judgment.

The fact remains that plaintiff in his Complaint makes no mention of the KWPA, and no reference to any statutory claim for wages or any statutory damages, including any reference to the statutory penalty under the KWPA. The plaintiff makes no mention of the KWPA in the final draft of the Pretrial Order, and makes no mention of the KWPA's statutory penalty. Rather, the "Nature of the Case' section of the final draft Pretrial Order states: "This is a breach of employment contract case."

The plaintiff makes no attempt to controvert the factual assertion of the defendant's counsel, that plaintiff, through his counsel, never represented or made any reference of the KWPA in any discussions or written correspondence with counsel for Defendant during discovery or at any time during this litigation. Further, counsel for plaintiff affirmatively stated during the April 18 conference that plaintiff did not intend to pursue a KWPA claim. Counsel stressed that, while plaintiff was seeking "vacation wages, ... severance, [and] wages for the days that he was not paid even before the termination in October," all claims for relief were grounded on the contract:

20

"[T]hose are all issues directly under the contract. We're only claiming the rights to those payments under the contact.... I didn't plead a wage and employment statute in this because *we're not relying on the statutes for any of the remedies*." (Tr., at 20) (emphasis added).

Further, this failure to explicitly raise the KWPA is not, as plaintiff now suggests (Dkt. 100, at 20), simply a matter of semantics. The KWPA carries a specific statutory remedy which arises in the event of willful violations. Discovery in the action has closed. By failing to given any meaningful notice of a KWPA claim, the defendant has been prejudiced by being denied the opportunity to conduct timely discovery on willfulness or other issues associated with the KWPA.

But even if the claim were properly before the court, the uncontroverted facts fail to establish a violation of the KWPA, which permits parties wide latitude in independently fixing their rights by contract. *See Richardson v. St. Mary Hosp.*, 6 Kan. App. 238, 241-42, 627 P.2d 1143 (1981). The Agreement specifically provided that Dr. Totonelly was not entitled to compensation "except as expressly provided in this Agreement." (Agreement, ¶ 14). As noted earlier, the Employment Agreement was properly terminated effective November 14, 2008,  pursuant to Paragraph 14(j). With the valid termination for breach under Paragraph 14(j), the prospective payment of additional notice pay and severance were excluded by the terms of the contract, and were not "earned" wages within the meaning of the KWPA.

IT IS ACCORDINGLY ORDERED this 27th day of February, 2012, that the plaintiff's Motion for Summary Judgment (Dkt. 83) is denied; the defendant's Motion for Summary Judgment (Dkt. 81) is granted, all as provided herein.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE